**HIGHLANDS RANCH UNIVERSITY PARK, LLC, a Colorado limited liability company, Plaintiff–Appellee,**

v.

**UNO OF HIGHLANDS RANCH, INC., a Colorado corporation; and Uno Restaurants, LLC, a Delaware limited liability company, f/k/a Uno Restaurants, Inc., a Massachusetts corporation, Defendants–Appellants.**

No. 03CA0724.

Colorado Court of Appeals, Div. V.

Jan. 27, 2005.

Brownstein Hyatt & Farber, P.C., Peter J. Korneffel, Jr., Richard B. Benenson, Denver, Colorado, for Plaintiff–Appellee.

Shughart Thomson & Kilroy, P.C., Philip W. Bledsoe, Rebecca N. Rundgren, Denver, Colorado, for Defendant–Appellant Uno of Highlands Ranch, Inc.

Wheeler Trigg & Kennedy, LLP, Terence M. Ridley, Michael D. Alper, Denver, Colorado, for Defendant–Appellant Uno Restaurants, LLC.

HUME *, J.

In this action for breach of a commercial lease, defendants, Uno of Highlands Ranch, Inc. (tenant) and Uno Restaurants, LLC (guarantor), appeal the trial court's judgment awarding damages, attorney fees, costs, and prejudgment interest in favor of plaintiff, Highlands Ranch University Park, LLC (landlord). We affirm in part, reverse in part, vacate in part, and remand with directions.

Guarantor is the parent company of tenant, which is a single-purpose entity created for the sole purpose of entering into the lease at issue here. Landlord is the owner of the lease site.

In June 2000, landlord and tenant entered into a ground lease, under which tenant was to construct a 5300–square foot building on the lease site and lease the premises for twenty years with options for renewal at the end of the lease term. Upon the expiration of the lease term or upon default under the terms of the lease, landlord was to receive ownership of the building constructed by tenant.

At about the same time, landlord and guarantor executed a guaranty agreement under which guarantor, in the event of default, guaranteed tenant's obligations under the lease. The liability of guarantor was limited to "a maximum of two years of all rent, monies and charges payable under the lease

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2004.

after default under the lease by [t]enant," plus all costs and attorney fees in connection with the enforcement of the guaranty.

In early December 2000, tenant informed landlord that it would not perform under the lease. Shortly thereafter, at landlord's request, tenant executed an estoppel certificate confirming that, while tenant was not yet in possession of the lease premises, the lease was, nevertheless, in full force and effect.

In May 2001, landlord completed site preparation under the lease terms and tendered the site to tenant for construction of the building. Tenant did not take possession of the site and did not commence construction.

In February 2002, landlord notified tenant that unless it responded otherwise, the lease would be terminated. Tenant did not respond. Subsequently, landlord gave notice of termination of the lease, caused construction of a somewhat larger building on the premises, and entered into build-to-suit leases with two new tenants. The combined rent from the two leases exceeded the rent payable under the original lease between landlord and tenant. The rental payments under the replacement leases commenced in early 2003.

In June 2002, landlord filed a complaint in the trial court, alleging that defendants had breached the lease and guaranty agreements. All parties moved for summary judgment on the issue of liability. The trial court granted landlord's motion, finding tenant and guarantor liable for breach of the lease and guaranty agreements. Thereafter, the case was tried to the court as to the scope of the guaranty and the amount of damages under both agreements.

The trial court found defendants jointly and severally liable to landlord in the amount of $1,450,076. That award represented the damages landlord incurred as a result of tenant's breach, plus landlord's costs and expenses incurred to mitigate its damages and to make the property leasable to the replacement tenants. The award also accounted for two years of lost rental incurred before monthly rental payments began under the replacement leases. Later, the trial court also awarded landlord $197,391.50 in attorney fees and costs pursuant to the terms of the lease and $50,365 in prejudgment interest.

## I. Liability under the Lease

Tenant contends that the trial court erred in granting summary judgment in favor of landlord on the issue of liability. We disagree.

Summary judgment is a drastic remedy and should only be granted upon a clear showing that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606 (Colo.1999). We review orders granting summary judgment de novo. *McIntyre v. Bd. of County Comm'rs*, 86 P.3d 402 (Colo.2004).

### A. Anticipatory Repudiation

An anticipatory repudiation of contract may occur upon a party's definite and unequivocal manifestation of its intention that it will not perform as required by the contract. *Johnson v. Benson*, 725 P.2d 21 (Colo.App.1986); *see also Lake Durango Water Co. v. Pub. Utils. Comm'n*, 67 P.3d 12 (Colo.2003)(a repudiation of a contract must consist of a present, positive, unequivocal refusal to perform the contract).

Here, tenant unequivocally told landlord on two occasions that it would not perform under the lease and, thereafter, suggested that landlord seek another tenant. In its brief, tenant admitted that it had notified landlord that it intended not to perform under the lease. Tenant's statements to landlord clearly evidenced its definite intent not to perform and, thus, amounted to an anticipatory repudiation or renunciation of the lease.

### B. Estoppel Certificate and Tender

Tenant also argues that landlord's request that it execute an estoppel certificate only days after tenant's repudiation and landlord's subsequent tender of the pad site to tenant five months after the repudiation demonstrate that landlord did not consider the lease to have been repudiated. We are not persuaded.

■ A continued willingness of the injured party to receive performance after a repudiation is an indication that, if the repudiator will withdraw its renunciation, but not otherwise, the contract may proceed. However, the innocent party does not thereby forfeit its right to treat the renunciation as a breach. The refusal of the renouncing party to retract the repudiation amounts to a continuation of the renunciation. *Bu–Vi–Bar Petroleum Corp. v. Krow*, 40 F.2d 488 (10th Cir.1930); *Builder's Concrete Co. v. Fred Faubel & Sons, Inc.*, 58 Ill.App.3d 100, 15 Ill.Dec. 517, 373 N.E.2d 863 (1978). So long as the repudiating party refuses to retract and continues its repudiation, the nonbreaching party may still elect to treat such repudiation as a breach. *Bu–Vi–Bar Petroleum Corp. v. Krow, supra* (citing 3 *Williston on Contracts* § 334).

Landlord, by its request that tenant execute the estoppel certificate and by its later tendering the site, manifested its willingness to accept withdrawal of tenant's repudiation. However, following the tender of the site, when tenant did not retract its repudiation, landlord was free to elect to treat tenant's previous repudiation and its continued refusal to perform under the contract as a breach.

### C. Notice of Default and Opportunity to Cure

While tenant admits that it notified landlord of its intent not to perform, it argues that even after such notification, landlord was obligated to provide tenant with the contractually required notice of default and opportunity to cure the breach. Tenant cites *Denver Ventures, Inc. v. Arlington Lane Corp.*, 754 P.2d 785 (Colo.App.1988), in support of this argument. We disagree.

In *Denver Ventures, supra*, the subcontractor committed a breach by unjustifiably stopping its performance after it had completed twenty-five percent of the work. The trial court held, and a division of this court agreed, that the contractor was required to give notice and opportunity to cure before declaring the subcontract terminated. Here, tenant expressly repudiated the lease before it commenced performance.

■ A repudiating party cannot enforce the provisions of the contract. *Lake Durango Water Co. v. Pub. Utils. Comm'n, supra; see Interbank Invs., L.L.C. v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224 (Colo.App.2000)(repudiation allows nonbreaching party to terminate contract without performing its part of the bargain); *see also Solitron Devices, Inc. v. Honeywell, Inc.*, 842 F.2d 274 (11th Cir.1988)(when party expressly repudiates contract, nonbreaching party is excused from complying with termination clause).

Here, tenant clearly communicated its intent not to perform under the lease, and thus landlord's compliance with the lease provisions requiring notice and opportunity to cure would have been futile acts. Although tenant now argues that it would have cured the breach upon receipt of the notice and opportunity to do so, its own internal records admitted in evidence indicate that its decision not to perform was final and was reaffirmed on several occasions.

### D. Event of Default

Tenant now argues that landlord's damages were not caused by an "event of default" as defined in the contract, and thus, the award of summary judgment was improper. We disagree.

Because tenant unequivocally repudiated the lease, we perceive no genuine issue of material fact to preclude judgment as a matter of law. *See Wren Reese, Inc. v. Great Lakes Structural Concrete Prods., Inc.*, 50 Ohio App.2d 168, 362 N.E.2d 269 (1975).

### II. Scope of Guaranty

Guarantor argues that the trial court erred when it interpreted the scope of the guaranty. We disagree.

■ As with contracts generally, in construing a guaranty, the court is required to give effect to the intentions of the parties, which must be deduced from the instrument as a whole. *Rohn v. Weld County Bank*, 155 Colo. 490, 395 P.2d 1003 (1964). Liability of a guarantor is to be strictly construed and reasonably interpreted according to the parties' intentions as disclosed by the surrounding circumstances. *See Valley Nat'l Bank v.*

*Foreign Car Rental, Inc.*, 157 Colo. 545, 404 P.2d 272 (1965); *Burkhardt v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 127 Colo. 251, 256 P.2d 234 (1953). Unless expressly agreed otherwise, a guarantor's liability is generally coextensive with that of the principal. *Cont'l Nat'l Bank v. Dolan*, 39 Colo.App. 16, 564 P.2d 955 (1977).

As in other areas of contract law, the language of a guaranty is determinative of the parties' intent, and its interpretation is a question of law that we review de novo. *See Lopez v. Dairyland Ins. Co.*, 890 P.2d 192 (Colo.App.1994).

The guaranty provided, in relevant part:

1. Guarantor hereby ... agrees ... to make the due and punctual payments of all rent, monies and charges payable under the Lease during the term thereof.

. . . .

Guarantor's liability hereunder shall be limited to a maximum of two years of all rent, monies and charges payable under the Lease after default under the Lease by Tenant.

. . . .

6. Guarantor shall, without limiting the generality of the foregoing, be bound by this Guarant[y] in the same manner as though Guarantor were Tenant named in the Lease.

### A. Construction Costs

Guarantor argues that the guaranty does not extend to construction costs because it does not expressly provide for construction costs and the language "rent, monies, and charges" cannot be interpreted to include such costs. We are not persuaded.

Initially, we disagree with guarantor's assertion that its liability is limited to the express terms of the guaranty. Contrary to guarantor's contention, the guaranty must be interpreted according to its terms and the intentions of the parties as disclosed by the surrounding circumstances. *See Valley Nat'l Bank v. Foreign Car Rental, Inc., supra; Burkhardt v. Bank of Am. Nat'l Trust & Savings Ass'n, supra; Cont'l Nat'l Bank v. Dolan, supra.*

1.

We reject guarantor's argument that "rent, monies, and charges payable under the Lease during the term thereof" do not encompass construction costs.

The cases guarantor relies upon are inapposite. In *Benton v. Lester*, 158 Ga.App. 696, 282 S.E.2d 174 (1981), the court held that the guaranty's language "all rentals" did not include liability for ad valorem taxes and cost of repairs. The court explained that the guaranty provided only for payment of "all rentals," and the tenant's obligation to pay taxes and cost of repairs came from an entirely separate part of the lease agreement that made no reference to rental payments.

In *Pham v. Mongiello*, 58 S.W.3d 284 (Tex. App.2001), the court held that the guaranty language "any payments (rent, late charges, attorneys fees, or others) under the lease" did not encompass charges incurred as a result of the tenant's negligence. The court explained that because negligent conduct is generally not foreseeable, a guarantor may be liable for damages caused by a tenant's negligence only if the guaranty expressly so provides for them.

Here, the guaranty contains a broad obligation to pay "all rent, monies and charges payable under the Lease." The construction costs were not only foreseeable, but also were required of tenant under the ground lease.

2.

Although the guaranty did not expressly provide for construction costs, the language describing guarantor's obligations is broad, and the terms "rent, monies and charges" do not have a technical meaning. Other than the limitation of time, the guaranty imposes no limitations on guarantor's liability. Moreover, under the lease, tenant was required to incur the costs of constructing the building.

We therefore conclude that the guaranty includes monies expended and charges incurred as a result of the construction of the building.

### B. Coextensive Liability

Guarantor next argues that the language in paragraph 6 of the guaranty only encompasses "non-substantive procedural and legal constraints" of guarantor. We disagree with that interpretation.

In construing the language of this section, we must look at the instrument as a whole and give effect to the intentions of the parties as disclosed by the surrounding circumstances. *See Rohn v. Weld County Bank, supra; Cont'l Nat'l Bank v. Dolan, supra.*

Here, under the terms of the guaranty, guarantor became liable for tenant's obligations under the lease, subject only to the two-year limitation following tenant's default. The record reveals that tenant executed the ground lease, and in addition to rental payments, tenant had an obligation to construct a building at its expense. As an entity created for a single purpose of entering into a lease, tenant had no assets, and the purpose of the guaranty was to assure performance by guarantor in the event of tenant's default.

Construing the language of this section together with other sections of the guaranty, the purpose of the guaranty, and the circumstances surrounding the execution of the guaranty, we conclude that guarantor's liability is coextensive with tenant's liability, subject to the two-year limitation.

### III. Measure of Damages

Defendants contend that the trial court erred in its calculation of landlord's damages. We agree.

Whether the trial court applied a correct legal standard is a question of law subject to de novo review. *See La Casa Nino, Inc. v. Plaza Esteban,* 762 P.2d 669 (Colo.1988). Under the "benefit of the bargain" rule, an innocent landlord is entitled to recover only the amount of damages required to place it in the same position it would have occupied had the tenant performed according to the terms of the lease. *Schneiker v. Gordon,* 732 P.2d 603 (Colo.1987).

Here, the trial court awarded landlord damages that included $1,218,155 for undisputed costs that landlord incurred in constructing a building on the lease site. The parties agree that landlord reasonably mitigated its damages by constructing the building and obtaining two replacement tenants who entered into build-to-suit leases. Tenant and guarantor presented evidence that the rental to be paid by the replacement tenants exceeded the rental that tenant would have paid over the twenty-year term of its ground lease. They also presented evidence that the value of the larger building constructed by landlord and leased to the replacement tenants, as of the expiration date of the ground lease and reduced to present value, substantially exceeded the value of the smaller building required under the lease as of the expiration date of the lease similarly reduced to present value.

Although the evidence concerning rental streams and terminal values of the respective buildings was disputed, the trial court made no findings on those issues. Instead, the court limited its mitigation and damages analysis to the first two years of the lease.

### A. Tenant's Setoff for Excess Replacement Rent

Weighing a landlord's mitigation efforts against the tenant's liability for rental usually involves "the reasonable rental value of the premises *for the duration of the term of the lease.*" *Schneiker v. Gordon, supra,* 732 P.2d at 612 (emphasis supplied); *see also La Casa Nino, Inc. v. Plaza Esteban, supra,* 762 P.2d at 673; *cf. Mining Equip. Inc. v. Leadville Corp.,* 856 P.2d 81 (Colo.App.1993). However, these cases do not preclude a landlord and a tenant from establishing a different temporal framework for calculating damages.

Here, subparagraph 10.2E of the ground lease contemplated that tenant's liability for rental to be paid during the entire lease term would be "reduced by any net sums thereafter received by [l]andlord." This paragraph does not contain any two-year limitation on the offset against tenant's liability.

Reducing a rental stream to present value is a factual issue subject to the trial court's resolution within its discretion. *See*

*McDonald's Corp. v. Brentwood Ctr., Ltd.,* 942 P.2d 1308 (Colo.App.1997).

Here, because the trial court made no findings concerning the present value of the excess rent anticipated from the replacement tenants, the matter must be remanded to determine the amount of the offset for net excess rents. That determination may include a discount for uncertainty concerning collectibility and any increased costs that landlord has incurred or will incur in connection with the replacement leases, to the extent such expenses are not already addressed in the award of construction costs.

Once the amount of excess rental has been determined, the trial court must offset that amount as a credit against lost rental under the lease.

The reduction in subparagraph 10.2E addresses only tenant's liability for rent. Tenant's obligation to construct a building is separate from its obligation to pay rent. While landlord's damage theory asserted that expenses to construct the new building were incurred to mitigate lost rent, such expenses more directly relate to tenant's construction obligation under the lease.

### B. Guarantor's Setoff for Excess Replacement Rent

Having concluded that tenant should receive an offset for net excess replacement rent against its liability for unpaid rent, we next must address guarantor's separate liability in light of the guaranty term limiting guarantor's liability "to a maximum of two years" after default. Other provisions of the guaranty persuade us that this limitation does not preclude guarantor from receiving a comparable offset for excess rent that landlord will collect beyond the two-year period.

First, under paragraph 3, guarantor waives any right of offset against amounts due under the guaranty "except to the extent permitted by the lease." We have previously noted that the lease does not contain a temporal limitation on tenant's right of offset.

Second, guarantor argues that under paragraph 4 of the guaranty, its liability is not affected by landlord's repossession of the leasehold, "provided, however, the net pay-ments received by [l]andlord, after deducting all costs and expenses of repossession and/or reletting the same, shall be credited from time to time by [l]andlord to the account of [g]uarantor." The phrase "from time to time" is inconsistent with limiting the credit to payments received by landlord during the two-year period.

Third, under paragraph 6, guarantor is "bound by the Guarant[y] in the same manner as though [g]uarantor were the [t]enant named in the Lease." This paragraph, upon which landlord relies to establish guarantor's liability for construction expenses, precludes the anomalous result that tenant's liability for unpaid rent would be less than that of guarantor because only tenant is entitled to the offset for net excess rent, projected over the entire term of the replacement leases.

In sum, unless otherwise agreed, a guarantor's liability is coextensive with that of the principal. *Cont'l Nat'l Bank v. Dolan, supra.* Here, the guaranty contains no express term extending guarantor's liability beyond that of tenant.

Accordingly, guarantor and tenant should be afforded the same offset for net excess rental from the replacement leases.

### C. Offset for Terminal Building Value

Had tenant performed under the lease agreement, it would have constructed a building at no cost to landlord. Instead, landlord constructed a larger building at its own expense. However, the trial court awarded landlord all its construction expenses as damages against tenant and guarantor even though landlord constructed a larger building.

Thus, landlord has obtained a windfall because the trial court did not offset landlord's damages for construction expenses against tenant and guarantor by the difference in terminal value between the building that tenant was to have constructed and the building that landlord in fact constructed. Under either the performance scenario or the breach plus award of construction expenses scenario, landlord would, in the future, obtain a building at no cost. Thus, to avoid a windfall for landlord, the award of construction expenses

against tenant and guarantor should be offset by the greater terminal value of the larger building that landlord owns, projected as of the termination date of the ground lease, and reduced to present value, less any additional expenses incurred by landlord in constructing the larger building not previously awarded by the trial court.

Accordingly, the damages award must be reversed, and on remand the court must conduct further proceedings to determine the extent that the present value of the replacement rental exceeds the present value of the rent payable under the ground lease; to determine the extent that the terminal value of the building that landlord constructed exceeds the terminal value of the building that tenant was to have constructed, reduced to present value; and to offset the damages against tenant and guarantor in the amount of those differences.

IV. Attorney Fees, Costs, and Interest

Defendants argue that the award of attorney fees and costs should be reduced based on our reduction in landlord's damages award. Because we remand for reconsideration of the damages award, we need not address this argument. The trial court should reconsider the attorney fees award when it reconsiders the damages award. In addition to reconsidering fees previously awarded, the trial court may also award reasonable attorney fees and costs incurred by landlord as a partially prevailing party on appeal.

 We agree with defendants that the trial court did not have jurisdiction when it granted the motion for prejudgment interest.

Under C.R.C.P. 60(a), clerical mistakes in judgments during pendency of the appeal may be corrected before the case is docketed in the appellate court, and while the appeal is pending, such mistakes may be corrected with leave of the appellate court.

Here, landlord filed a motion for prejudgment interest on March 28, 2003. Defendants filed the notice of appeal with this court on April 11, 2003. When the trial court entered its order granting landlord's motion on May 9, 2003, it was without jurisdiction to do so. *See Molitor v. Anderson,* 795 P.2d 266 (Colo.1990)(filing of a notice of appeal divests a trial court of authority to consider matters of substance affecting directly the judgment appealed from). Therefore the order for prejudgment interest must be vacated, and on remand the trial court must reconsider the issue after it reacquires jurisdiction.

The judgment is reversed as to the amount of damages and vacated as to the award of prejudgment interest, and the case is remanded for further proceedings on those matters consistent with this opinion. In all other respects, the judgment is affirmed.

Judge DAILEY and Judge WEBB concur.